# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| RHEANNA SENAKIA HARBIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 09-CV-688-PJC |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner of the | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Claimant, Rheanna Senakia Harbin ("Harbin"), requests judicial review pursuant to 42 U.S.C. § 405(g) of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying Harbin's application for supplemental security income ("SSI") under the Social Security Act, 42 U.S.C. §§ 401 *et seq*. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Harbin appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Harbin was not disabled. For the reasons discussed below, the Court **REVERSES AND REMANDS** the Commissioner's decision.

### Claimant's Background

Harbin was 37 when she appeared before the ALJ on March 25th, 2009. (R. 24, 55). Harbin testified that she is a college graduate and was employed by Tulsa Public Schools as a kindergarten teacher until 1998. (R. 26-27, 58). She left her job as a kindergarten teacher due to

complications finding adequate daycare. (R. 27). Harbin then began operating a daycare on a full time basis until 2004. (R. 27-28). Her day care was originally licensed for seven children, and during her last year operating the daycare it was licensed for nine. (R. 28).

Harbin closed her daycare because she was expecting the birth of a child who was born on January 4, 2005. (R. 28-29). Harbin had five children, all of whom lived at home. (R. 52). She had intended to take six weeks off and then return to operating the daycare on a full time basis. (R. 28). However, after the six weeks passed, she did not feel ready to take care of children, and she decided not to re-open the daycare. *Id.*

Harbin testified that on a typical day she rose at about 5:45 a.m. to get dressed, then woke her children, prepared them, drove them to school, and walked them to their class rooms. (R. 37-38, 44). Once she returned home, she usually rested on the couch or in bed until she felt she could proceed with her day's activities. (R. 44). Harbin testified that the movement, noise, and daylight of her morning routine aggravated all of her various pains. (R. 37-38, 44). She also took several naps a day due to her inability to stay asleep at night. (R. 45).

Harbin testified that her children did most of the house work while she participated in a supervisory capacity. (R. 46). Harbin prepared meals for her family almost daily, washed the dishes, and did the laundry with help. (R. 46). Harbin testified she could bend and lift, but relied on her cane or children to help her most of the time. (R. 46-47). Harbin used her cane every day all day to assist her with walking. (R. 40).

Harbin used heating pads, ice packs, and back massagers with heat to help with the pain. (R. 47). She also took ibuprofen occasionally and had taken prescription pain medications, but tried to avoid the use of pain medications on days she drove because they made her drowsy. (R.

47, 52). Harbin testified that at times the pain she felt was so intense it caused her to become frustrated, confused, and forgetful. (R. 48). She admitted her pain was sporadic, and she believed colder and rainier weather could trigger it. *Id.* Harbin estimated that at least four times a month she was unable to take her children to school or to attend church. (R. 51).

Harbin alleged that she became disabled on March 1, 2007. (R. 28). Harbin testified that her most significant pain emanated from her neck and back and that the pain in her neck was constant. (R. 29-30). She described the pain in her neck as a four on a scale of one to ten. (R. 31). She testified that her range of motion in her neck was limited. *Id.* Harbin was wearing a soft cervical collar at the hearing and testified that she wore it all day except when sleeping, showering, and exercising. (R. 41). Harbin described the pain in her neck as moving through the back of her neck and up through the top and middle of her skull. (R. 32). It also moved down through her shoulders, upper back, and into her arms and hands. *Id.*

Harbin testified she had carpal tunnel syndrome ("CTS") in her right hand and described a feeling of joint pain, stiffness, numbness, and tingling throughout her wrist and the left side of her palm. (R. 32-33). Harbin testified the problems extended to her left hand as well. (R. 33). She described her hands as "locking up" and losing grip when she was carrying various objects, causing her to drop them. (R. 32-33).

Harbin could reach her arms over her head. (R. 33). However, she testified that prolonged extension of her arms caused dizziness and a feeling of being overwhelmed. (R. 34). In particular, Harbin noticed this effect when she washed her hair, noting that she must sit down or lean to finish washing and rinsing. *Id.* Harbin also testified that her ability to extend her arms in front of her was impaired. (R. 35). She estimated the total amount of time she was able to

extend her arms was less than three minutes before it began to aggravate her shoulders and upper back. *Id.* Harbin testified that she could touch her knees, but not her toes. (R. 46).

Harbin testified that any bending or lifting could cause her lower back to "catch" which resulted in pain to her upper back, neck, and legs. (R. 38-39). She described the pain felt in her legs as "numbness and tingling" throughout her calves and knees. (R. 39). When she experienced this pain she rested on her couch or bed. (R. 40). Harbin estimated this problem occurred two to three times a week. (R. 40).

Harbin alleged problems with headaches and estimated that they occurred at least six days a week. (R. 35). The headaches lasted anywhere from 45 minutes to 5 hours depending on whether she was able to lie down and rest. *Id.* Harbin testified that lifting objects weighing more than a few pounds could trigger her headaches. (R. 36). She cited that carrying a four-pound bag of sugar to the front of the grocery store could trigger a headache. *Id.* Harbin also testified that in the last few years her eyes had been sensitive to light and that darkness in general helped settle her nerves and dissipated her headaches. *Id.*

Harbin began using her cane in November of 2007. (R. 40). After dropping her children off at school, while walking on the sidewalk, she felt as though she might fall, and she had been using the cane all day every day ever since. *Id.* Harbin testified that she could walk without the cane but said that she could do this for no more than two minutes, while with the cane she could walk for seven to ten minutes. (R. 42). She said that walking for a sustained amount of time created a feeling of being winded. *Id.* Harbin testified that she could stand without the aid of the cane or leaning for about a minute. *Id.* She also testified to problems sitting still for periods of time before changing position. (R. 38, 42, 45). Harbin said that she could sit for about five to

4

seven minutes before "things start locking up and getting stiff" and about ten minutes before she had to stand up. (R. 43-44).

Harbin testified that she had pain in her feet. (R. 44, 50). She testified this caused her to hobble with her cane until the pain dissipated. (R. 44). She estimated the pain lasted for "just a minute." (R. 50). Harbin attributed her foot problems to fallen arches and neuropathy. *Id.* Harbin testified that she had been having sporadic chest pains since December 2008. (R. 49).

The administrative record showed that Harbin was first seen at Utica Park Clinic on June 23, 2003. (R. 273). Her chief complaint was neck pain. *Id.* Alex Lyle, PAC, circled positive findings for myalgias and morning stiffness under the musculoskeletal section. *Id.* On Febuary 5, 2004, it appears that Harbin was seen by Dr. Landgarten. (R. 271). Harbin said she had a weird feeling in her chest and that whenever she carried her children or lifted anything, she got worse. *Id.* She also stated that when she rolled over at night it woke her up. *Id.* On physical examination the chest was symmetrical but tender to palpation at the costochondral, and her extremities showed no edema. *Id.* Dr. Landgarten's impression was costochondritis. *Id.* His treatment plan included Mobic, Flexeril, hot moist packs to the chest, and instructions to return to the clinic if her symptoms increased. *Id.*

On June 14, 2005 Harbin was seen by Mr. Lyle for a physical examination. (R. 266). On examination her extremities showed full active and passive range of motion, with no edema. *Id.* Harbin was next seen by Mr. Lyle on December 15, 2005, with a complaint of pain in the left scapular area. (R. 260). Physical examination revealed that her left shoulder had full range of motion, but there was pain to palpation of the left suprascapular over the medial aspect. *Id.* Mr. Lyle's impression was left subscapular bursitis. He recommended prescription medication and

said that he would consider a corticosteroid injection if the area had not improved within two weeks. *Id.* Harbin was then seen two weeks later for a follow up by Mr. Lyle. (R. 259). His impression was that the subscapular bursitis had improved. *Id.*

Harbin was seen by Arlynn Irish, PA-C, at the Oklahoma Physician's Group ("OPG") on May 30, 2006 with complaints of foot pain, an umbilical hernia, and spasms in her neck. (R. 174, 258). Mr. Irish referred Harbin to a podiatrist for her feet, to a surgeon for her umbilical hernia, and instructed her to take ibuprofen for her neck. *Id.* Mr. Irish informed her the ibuprofen should resolve her neck pain. *Id.* On March 29, 2007 Harbin returned to OPG reporting discomfort in the right side of her neck radiating to her shoulder and discomfort with rotation of her head. (R. 169). Dr. Landgarten ordered an x-ray of the cervical spine and prescribed medication. *Id.* The x-ray of the cervical spine revealed moderate narrowing of the C5-6 disc space. (R. 168).

Harbin was referred by Dr. Landgarten to The Orthopaedic Center ("TOC") and was seen there on May 8, 2007. (R. 187). Harbin presented severe neck pain, upper extremity weakness, severe weakness in the left arm, and tingling to the upper and lower extremities. *Id.* Harbin also reported a history of nerve problems in her feet. *Id.* Her physical examination revealed weakness of extension of her left thumb and numbness in the first webspace bilaterally, as well as diminished grip strength of the right hand, and a highly antalgic gait. (R. 188). The impression of Steven Anagnost, M.D. was cervical herniated nucleus pulposus with radiculopathy, chronic lower extremity radiculopathy, and upper extremity weakness. *Id.*

On May 15, 2007 a magnetic resonance imaging ("MRI") report was conducted at TOC. (R. 178). The MRI revealed a tiny central disc spur complex at C4-5, as well as degenerative

disc disease and osteophyte[1] spurring with mild diffuse disc bulge demonstrating a central/right paracentral broad based component with mild encroachment on the right neural foramen at C5-6. *Id.* On May 18, 2007 Harbin returned to the TOC with complaints of neck pain, as well as bilateral shoulder pain and numbness. (R. 190). Harbin was prescribed physical therapy with home traction and trans-epidermal neural stimulation ("TENS") unit. (R. 190-191).

Electrodiagnostic ("EMG") testing of the lower back on May 23, 2007 showed mildly increased insertional activity in the lower lumber paraspinal musculature with non-sustained positive sharp waves and fibrillations. (R. 182). The EMG also showed a mildly increased insertional activity at the left gastrocnemius muscle as well as chronic neuropathic motor unit changes in that region as well as the L5 and S1 unnervated musculature bilaterally. *Id.* The study showed no significant abnormalities of the lower extremities. *Id.*

Harbin presented to physical therapy at TOC on May 25, 2007 wearing a soft cervical collar and reporting pain that radiated into her shoulders as well as her left thumb. (R. 179). The manual examination of Ginny Kropiewnicki, RPT, found symmetrical strength in the bilateral upper extremities graded at 4/5, most likely due to pain, as well as guarding and decreased mobility throughout the cervical spine. *Id.* Ms. Kropiewnicki suggested Harbin try to wean herself from the cervical collar. *Id.*

Harbin returned to TOC for EMG testing of the upper extremities on May 30, 2007. (R. 183). She reported persistent upper back and neck pain, as well as achiness, weakness, and numbness in the upper extremities and hands. *Id.* Her physical examination revealed a mild

---

[1] Osteophyte is "[a] bony excrescence or outgrowth, usually branched in shape." Taber's Cyclopedic Medical Dictionary 1384 (17th ed. 1993).

7

decrease in sensation of fingers 1-3 bilaterally, with negative Tinel's bilaterally. *Id.* Spurling's elicited a mild amount of pain in the upper back and shoulders. *Id.* Andrew Briggeman, D.O., found bilateral C6 radiculopathies and evidence suggestive of very mild CTS in the right wrist, but ultimately concluded that a majority of her symptoms were occurring from her neck, rather than her right wrist. *Id.* Dr. Briggeman mentioned that Harbin might benefit from a rheumatological work up, as well as cervical and lumbar epidural steroid injections. *Id.*

On May 31, 2007, Harbin presented to physical therapy wearing her neck brace and complained of pain in her neck and shoulders. (R. 181). She also noted having symptoms in her left ring finger. *Id.* Harbin stated that she had tried weaning off of her cervical collar, but reported that she began to hurt after two hours without it. *Id.* Sharon Newton, RPTA, discussed weaning off of the cervical collar for thirty minutes at a time. *Id.* Harbin reported no pain after therapy and stated that she was feeling much better. *Id.* Ms. Newton noted that Harbin's co-pay of thirty dollars per visit was causing a problem with her ability to come in frequently. *Id.*

Harbin returned to TOC on June 12, 2007 to go over the results from the EMG testing. (R. 192). Jodie Popp, PA-C found cervical pain, degenerative disc disease with herniated nucleus pulposus at C5-6, positive EMG finding at C6, and evidence of mild right-sided CTS. *Id.* Harbin was placed in a cock-up splint for CTS (to be worn at night) and was advised to continue physical therapy with a home program, as well as to use the home TENS unit. *Id.* Harbin additionally reported symptoms of back pain and requested an evaluation of her lumbar spine. *Id.* Ms. Popp planned to refer her for an MRI, and to obtain x-rays of her low back, as well as lab work to rule out rheumatoid arthritis. (R. 192-93).

The MRI took place on June 27, 2007 and a report was prepared by Anne Kozlowski, DO. (R. 283). During a follow up appointment at TOC on July 5, 2007, Harbin complained of pain from her neck to her shoulders, hands, arms, legs, and feet bilaterally. (R. 194, 283). The MRI of the lumbar spine revealed a shallow broad-based disk bulge at L5-S1 without stenosis or foraminal narrowing and the EMG showed very mild chronic irritation at L5-S1. *Id.* When Ms. Popp conveyed that the cervical collar was actually making her muscles weaker, Harbin insisted on wearing the collar secondary to pain. *Id.* Ms. Popp made no surgical recommendations but noted that if Harbin's neck symptoms failed to improve they would discuss with Dr. Anagnost possible surgical intervention or discography. (R. 194-95). As a result of Harbin's multiple complaints, Ms. Popp suggested a neurological evaluation to rule out any type of pathology. (R. 194).

On July 18, 2007, Harbin returned to TOC wearing her cervical collar and saw Dr. Briggeman. (R. 185). She reported persistent joint pain, as well as generalized muscle pain and weakness. *Id.* Dr. Briggeman stated that her upper and lower extremity weakness and neuralgia had worsened over the past few months. *Id.* Her physical examination showed mild hand intrinsic muscular atrophy and bilateral grip weakness. *Id.* Dr. Briggeman's impression was cervical degenerative disc disease with radiculapathy, degenerative lumbar spondylosis, cervical lumbar myofasciitis, generalized joint and muscle pain of questionable etiology, and neuralgia. *Id.* He prescribed Lyrica and recommended a cervical epidural for pain. *Id.* Dr. Briggeman also recommended that Harbin continue her cervical traction unit with her TENS unit and suggested the possible need for more physical therapy in the future. (R. 186).

On August 6, 2007 Harbin began treatment with Jeanne Edwards, M.D. (R. 220-38). Harbin reported severe pain throughout her body, feelings of electric shock going from her foot into her back when she walked, and headaches that started over the occipital notch bilaterally and extended on to the head and forehead. (R. 220, 236). Harbin also told Dr. Edwards that the EMG and nerve conduction study failed to reveal an etiology. *Id.* Harbin affirmed the presence of light sensitivity, neck pain and stiffness of the neck, a recent history of intolerance toward heat and cold, swelling of the legs/feet, hands, leg pain while walking, muscle pain, joint pain, back stiffness/pain, neck stiffness/pain, numbness, and mood changes. (221, 234).

Dr. Edwards' physical examination revealed Harbin's extremities were without edema. (R. 223, 236). Harbin's deep tendon reflexes were all 3-4+ and equal, her toes were downgoing bilaterally with negative drift and negative Romberg. (R. 224, 237). Her motor ability and strength were good and equal in all muscle groups tested, with no asymmetry or atrophy. *Id.* Harbin's sensation and perception were intact to pinprick, position sense, light touch, vibratory, and thermal sensation. *Id.* Dr. Edwards' impression was that Harbin had dysesthesias[2] throughout her body. *Id.* She also opined that fiber neuropathy or fibromyalgia might be the underlying etiology of her symptoms and that the briskness of the reflexes suggested a myelopathic process. *Id.* Dr. Edwards recommended an MRI of the brain and a bone scan. *Id.*

The MRI of the brain and a bone scan were performed on August 31, 2007 and September 17, 2007, respectively. (R. 210, 212, 226, 228). On September 28, 2007 Harbin returned to Dr. Edwards to review the MRI and the scan. (R. 218-19). On this date Harbin

---

[2]Dysesthesia is "[a]bnormal sensations on the skin, such as experiencing a feeling of numbness, tingling, prickling, burning, or cutting pain." Taber's Cyclopedic Medical Dictionary 590 (17th ed. 1993).

arrived wearing a cervical collar. (R. 218). Dr. Edwards' report found that the MRI scan of the brain was negative and the bone scan revealed mild scoliosis but no significant changes. *Id.* She found that Harbin did have degenerative change in the cervical and lumbar region and that the EMG and nerve conduction study did reveal evidence of inflammation at the C6-7 levels. *Id.* Dr. Edwards stated that she could not totally exclude a small fiber neuropathy, but that at this time, there was no evidence for demyelinating disease. *Id.* Dr. Edwards' examination on this date revealed that Harbin was awake and alert, moving all extremities well without focal deficits, and that Harbin had a gait within normal limits. *Id.* Dr. Edwards' impression was dysesthesias throughout Harbin's body, with no evidence of a radiculopathy, spinal stenosis, or primary demyelinating disease. *Id.* Dr. Edwards prescribed Neurontin. *Id.*

Harbin returned to Dr. Edwards on October 31, 2007 because of continued discomfort. (R. 217). Examination on this date revealed that Harbin was awake and alert, she moved all extremities well without focal deficits, and her gait was within normal limits. *Id.* Dr. Edwards' impressions reiterated Harbin's dysesthesias throughout her body but stated that no definite etiology could be determined. *Id.* Dr. Edwards recommended a chronic pain program to Harbin and gave her a trial of Cymbalta because the Neurontin made her too drowsy. *Id.*

Harbin was then seen at Central States Orthopedic Specialist ("CSOS") by David S. Hicks, M.D., on November 1, 2007. (R. 296-97). Harbin related her symptoms (severe cervical spine and low back pain caused by lifting, twisting, moving her neck, going up and down stairs, lifting and bending, as well as occasional feelings of tingling and numbness in her arms and hands) and her prescribed treatments (TENS unit, therapy, traction, physical therapy, manipulation, and medications). *Id.* The physical examination revealed tenderness over the

posterior elements of the lower cervical spine (both medial scapular angles) and head compression. *Id.* Spurling maneuvers reproduced axial cervical spine pain only. *Id.* Her shoulders were benign and there was no pattern of motor reflex or sensory loss in either upper extremity to suggest a cervical radiculopathy. *Id.*

Tinel's and Phalen's were negative at both wrists and elbows. *Id.* Her thoracic and straight leg raise maneuvers were negative bilaterally with no clear pattern of motor, reflex or sensory loss in either lower extremity. *Id.* Babinski's were plantar bilaterally, and the range of motion in both hips was normal. *Id.* Dr. Hicks' review of plain x-rays revealed cervical spine changes consistent with moderate degenerative cervical spodylosis at C5-6 and narrowing of the L5-S1 interspace. *Id.* His review of the MRI done June 27, 2007 at TOC showed a shallow broad based disc protrusion eccentric to the left at L5-S1. *Id.* Dr. Hicks' impression was that Harbin suffered from painful internal disc derangement with motion segment dysfunction at C5-6 and L5-S1. *Id.* He discussed cervical epidural steroid injection with her and made arrangements to administer that treatment. *Id.*

On November 6, 2007 Harbin arrived at Saint Francis Hospital for her epidural steroid injection at C5-6 performed by Frank Hackl, M.D. (R. 288). Harbin's preoperative diagnosis was listed as cervical radiculopathy at C5-6. *Id.* She arrived wearing her soft cervical collar. *Id.* Harbin was again seen by Dr. Hicks at CSOS on November 21, 2007. (R. 281). Dr. Hicks again diagnosed Harbin as having pathology at C5-6 and L5-S1. *Id.* He also reiterated that she did not have a clear pattern of motor, reflex, or sensory loss in either upper extremity. *Id.*

On December 31, 2007 Harbin was seen again by Dr. Hicks for cervical spine pain and low back pain. (R. 280). Dr. Hicks discussed the need for cervical and/or lumbar discography

and noted that, to him, Harbin did not think her symptoms were serious enough to consider surgical intervention. *Id.* Harbin then had a cervical provocative diskogram at C3-4, C4-5, C5-6, and C6-7 at Saint Francis Hospital on February 14, 2008. (R. 302-03). The results of the diskogram revealed that C6-7 was the only disk that did not produce pain. *Id.* The C5-6 disk reproduced the pain that Harbin felt most of the time, which was pain to the posterolateral portion of her neck that radiated into both shoulders, the left being worse than the right. *Id.* The C3-4 and C4-5 disks also reproduced pain, but it was an intermittent pain pattern. *Id.*

On February 21, 2008, Harbin was seen by Arlynn Irish, PA-C, at the OPG. (R. 305). Mr. Irish reviewed Harbin's chart which revealed she had some small disc protrusions to the cervical area. *Id.* He noted that from what he could see there was no foraminal stenosis. *Id.* Harbin arrived wearing her cervical collar. *Id.* Mr. Irish explained to her that usage of the soft collar was actually going to make her muscles much weaker and thereby make things more debilitating, but she would not give up the soft collar. *Id.*

Harbin was then seen on March 7, 2008 by Dr. Hicks at CSOS. (R. 301). Harbin told Dr. Hicks that she had a history positive for fibromyalgia. *Id.* Dr. Hicks did not think it was clear to him that Harbin was a strong candidate for a cervical fusion, and he believed that she was certainly not a good candidate for a 3-level cervical fusion. *Id.* Dr. Hicks discussed with Harbin the possibility of proceeding with an anterior cervical discetomy and fusion at C5-6 with allograft and Zephyr spinal instrumentation. *Id.* He also gave her the names of several rheumatologists for a more in depth evaluation of her fibromyalgia claim. *Id.*

Harbin was seen by Alok Pasricha, M.D. on June 8, 2009. (R. 4). Harbin described her symptoms as including headaches and generalized body pain, neck pain and muscle spasms,

memory loss and difficulty concentrating, fatigue, and difficulty walking. *Id.* She also explained that she dropped objects and her hands felt numb and that she had been diagnosed with CTS in her upper extremities and degenerative joint disease of the cervical spine. *Id.* She also mentioned that she switched to another physician because she was "not getting anywhere with her previous orthopedist." *Id.* Upon physical examination Dr. Pasricha found her motor strength to be 5/5 with nonorganic give-way weakness in the lower extremities. *Id.* Harbin's deep tendon reflexes were 3+ in the upper extremities, 3+ in the lower extremities with no pathological spread. *Id.* Her sensory function was intact to light touch and pinprick, and her station, gait, and coordination revealed she exhibited difficulty walking upon starting to walk, which Dr. Pasricha found was not organic in origin. (R. 5). Harbin had good postural reflexes. *Id.*

Luther Woodcock, M.D., an agency nonexamining consultant, completed a Physical Residual Functional Capacity Assessment on August 31, 2008. (R. 198-205). Dr. Woodcock determined that Harbin could occasionally lift and/or carry 50 pounds and frequently lift and/or carry 25 pounds. (R. 199). She could stand, walk, and sit for about 6 hours in an 8-hour workday. *Id.* He found no limits in her ability to use hand and/or foot controls and to push or pull. *Id.* For narrative explanation, Dr. Woodcock referred to the MRIs of Harbin's lumbar and cervical spine. *Id.* He also referred to her activities of daily living. (R. 199-200). He also briefly summarized Dr. Edwards' examination of August 6, 2007. (R. 200). Dr. Woodcock specifically stated that her impairments supported his RFC determination, and that Harbin's pain would not impose further limitations. *Id.* Dr. Woodcock found that Harbin could only occasionally stoop or crouch, but could frequently climb, balance, kneel, or crawl. *Id.* Dr. Woodcock found no manipulative, visual, communicative, or environmental limitations. (R. 201-05).

**Procedural History**

Harbin filed an application on August 3, 2007 seeking SSI benefits under Title XVI, 42 U.S.C. §§ 401 *et seq*. (R. 103-06). The application was denied initially and on reconsideration. (R. 61-64, 67-69). A hearing before ALJ Deborah L. Rose was held March 25, 2009 in Tulsa, Oklahoma. (R. 24-58). By decision dated April 22, 2009, the ALJ found that Harbin was not disabled at any time through the date of the decision. (R. 15-21). On August 27, 2009, the Appeals Council denied review of the ALJ's findings.[3] Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of further appeal. 20 C.F.R. § 416.1481.

**Social Security Law and Standard of Review**

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if her "physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] pervious work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520.[4] *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th

---

[3] The administrative transcript does not contain a copy of the Action of Appeals Council on Request for Review dated August 27, 2009. However, Harbin alleged that this was the action that made the decision of the ALJ the Commissioner's final decision. Complaint, Dkt. #2. The Commissioner has not asserted that this Court lacks subject matter jurisdiction over this case, and therefore the Court assumes that the absence of a copy of the August 27, 2009 Appeals Council action is a clerical error.

[4] Step One requires that claimant to establish that she is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.151. Step Two requires that the claimant establish that he

Cir. 1988) (detailing steps). "If a determination can be made at any of the steps that a claimant is or is not disable, evaluation under a subsequent step is not necessary." *Williams*, 844 F.2d at 750.

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquires: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id*. The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever the record fairly detracts from its weight.'" *Id., quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner. *Hamlin*, 365 F.3d at 1214 (quotation omitted).

---

has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 4041520(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform. *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of the past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

## Decision of the Administrative Law Judge

At Step One, the ALJ found Harbin had not engaged in substantial gainful activity since her application date of August 3, 2007. (R. 17). At Step Two, the ALJ found that Harbin had severe impairments of "degenerative disk disease and degenerative joint disease of the cervical and lumbar spine." *Id.* The ALJ discussed Harbin's allegation that she had CTS and found that the medical records did not support her claim. *Id.* The ALJ found that "[w]ith no definite diagnosis of [CTS] from any medical source" it could not be considered a severe impairment. *Id.* At Step Three, the ALJ found that Harbin's impairments did not meet a Listing. (R. 18).

The ALJ determined that Harbin had the RFC to do less than the full range of medium work, stating that Harbin could lift 25 pounds frequently, or 50 pounds occasionally, with occasional stooping and crouching. *Id.* At Step Four, the ALJ found that Harbin was capable of performing her past work as a kindergarten teacher. (R. 20). Therefore, the ALJ found that Harbin was not disabled from August 3, 2007 through the date of her decision. *Id.*

## Review

Harbin makes several arguments, but the Court addresses only the failure of the ALJ to discuss the evidence supporting Harbin's assertion that she suffered from CTS and that therefore her ability to use her right hand should have been considered when the ALJ made her RFC determination. The Court finds that reversal is required because the ALJ failed to consider the evidence favorable to Harbin's claim that she had CTS and therefore had limited use of her right hand.

It is oft-stated law in this circuit that an ALJ must discuss more than just the evidence favorable to an opinion that a claimant is not disabled:

> [I]n addition to discussing the evidence supporting his decision, the ALJ also must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects.

*Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996). It is error to ignore evidence that would support a finding of disability while highlighting the evidence that favors a finding of nondisability. *Frantz v. Astrue*, 509 F.3d 1299, 1302 (10th Cir. 2007). A bare conclusion, without discussion, is beyond meaningful judicial review, and therefore an ALJ is required to discuss the evidence and give reasons for her conclusions. *Clifton*, 79 F.3d at 1009.

The ALJ discussed Harbin's claim of CTS at Step Two[5] and determined that the medical records did not support Harbin's claim. (R. 17). In explanation of this statement, the ALJ cited to records of Dr. Edwards and Dr. Hicks that did not mention CTS and that also found no significant neurological condition. *Id.* The difficulty with the ALJ's analysis is that she ignored the medical evidence that supported Harbin's claim. On May 30, 2007 while at TOC for EMG testing, physical examination revealed a mild decrease in sensation of fingers 1-3 bilaterally, and Dr. Briggeman found the electrodiagnostic evidence was suggestive of mild CTS in the right wrist. (R. 183-84). Additionally, on June 12, 2007 when Harbin returned to TOC to discuss the results of the EMG testing, she was prescribed a cock-up splint to be worn at night for her CTS.

---

[5] It is well-settled law in this circuit that any error at Step Two is harmless so long as the ALJ finds at least one condition to be severe, so that the five-step sequential evaluation continues. *Oldham v. Astrue*, 509 F.3d 1254, 1256-57 (10th Cir. 2007) (no error in ALJ's failure to include claimant's reflex sympathetic dystrophy as severe impairment at Step Two); *Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008) (any error at Step Two was harmless when ALJ properly proceeded to next step of evaluation sequence). Therefore, because the ALJ found severe impairments at Step Two, there was no reversible error at this step. The error was in failing to continue to consider Harbin's alleged CTS when she made her RFC determination, and the ALJ's analysis of why she did not consider the allegation of CTS occurred at Step Two in her decision.

(R. 192). The ALJ had a duty to discuss this evidence in more detail than dismissing the diagnosis at Step Two because the ALJ characterized it as not "definite." The ALJ may not simply ignore medical evidence found in the administrative record. She must consider all the impairments documented in the record throughout the disability process. *Carpenter*, 537 F.3d at 1265-1266; *Givens v. Astrue*, 251 Fed. Appx. 561, 568 (10th Cir. 2007) (unpublished) (ALJ erred by stating that there was no objective medical evidence of CTS when there were several references in the medical record). The ALJ's failure to acknowledge or reflect on the medical evidence found in the administrative record that supported Harbin's claims regarding CTS requires that the decision be reversed and remanded.

The undersigned emphasizes that "[n]o particular result" is dictated on remand. *Thompson v. Sullivan*, 987 F.2d 1482, 1492-93 (10th Cir. 1993). This case is remanded only to assure that the correct legal standards are invoked in reaching a decision based on the facts of the case. *Angel v. Barnhart*, 329 F.3d 1208, 1213-14 (10th Cir. 2003), *citing Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988).

Because the error of the ALJ related to the failure to discuss medical evidence found in the record tending to support Harbin's claims regarding CTS requires reversal, the undersigned does not address the other contentions raised by Harbin. On remand, the Commissioner should ensure that any new decision sufficiently addresses all issues raised by Harbin.

**Conclusion**

Based on the foregoing, the Court **REVERSES AND REMANDS** the decision of the Commissioner denying disability benefits to Harbin for further proceedings consistent with this Order.

Dated this 31st day of March, 2011.

Paul J. Cleary
United States Magistrate Judge